UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JOSE HERRERA,

                    Plaintiff,

        -against-                                         11 Civ. 1901 (LAK)

METROPOLITAN LIFE INSURANCE COMPANY, et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

                  Appearances:

                  Eric Wertheim
                  Val Mandel
                  VAL MANDEL, P.C.
                  *Attorneys for Plaintiff*

                  Penelope Margaret Taylor
                  MCCARTER & ENGLISH, LLP
                  *Attorneys for Defendants Metropolitan Life Insurance*
                  *Company & BNY Mellon Investment Servicing (U.S.), Inc.*

                  Harold R. Burke
                  LAW OFFICES OF HAROLD R. BURKE
                  *Attorneys for Defendants Karen Zelenz & Mark Zelenz*

                  David Jones
                  Amy A. Barcelo
                  Assistant United States Attorneys
                  PREET BHARARA
                  UNITED STATES ATTORNEY
                  *Attorneys for* Amicus Curiae *United States of America*

LEWIS A. KAPLAN, *District Judge.*

This unusual case presents, among other questions, the issues of whether (1) the widower of a deceased postal worker is precluded from receiving the death benefit payable on his deceased spouse's federal group life insurance if he is an alien who is not legally in this country, (2) the insurer may be held liable to the widower for that death benefit despite the fact that it previously paid the benefit, albeit not to the widower but to the deceased spouse's daughter by another marriage, who allegedly forged the widower's signature to collect the money, and (3) the stepdaughter may be held liable to the widower for conversion or unjust enrichment.

*Facts*

*The Complaint*

The corrected first amended complaint ("Cpt") alleges the following:

Plaintiff Jose Herrera was married to and resided in New Jersey with Maria Diaz until she passed away on June 24, 2006.[1]  At the time of her death, Diaz was covered by a Federal Employee Group Life Insurance ("FEGLI") policy issued by defendant Metropolitan Life Insurance Company ("MetLife").[2]  In addition, her beneficiaries or survivors were entitled to various death benefits under the federal Thrift Savings Plan ("TSP").[3]

Diaz was survived not only by Herrera but by Karen Zelenz, Diaz's child of a prior

---

[1]    Cpt ¶¶ 8, 10.

[2]    *See id.* ¶ 9.

[3]    *See id.* ¶ 19.

marriage.[4]  Following Diaz's death, MetLife, instead of paying the proceeds of the FEGLI policy

in a lump sum, established a so-called Total Control Account at defendant the Bank of New York

Mellon Corporation ("Mellon").[5]  Zelenz, allegedly aided and abetted by her husband, Mark Zelenz,

completed a claim for death benefits for the Total Control Account  some time prior to August 2008,

forged Herrera's signature to it, and directed MetLife to send the checkbook for the account to the

Zelenz home in Bedford, New York.[6]  MetLife did so, following which Ms. Zelenz forged checks

totaling $302,820.89 for the benefit of herself, her husband, and others on that account.[7]  The

Zelenzes are alleged also to have misappropriated $163,000 in TSP and other death benefits.[8]

On or about October 26, 2009, the Office of FEGLI ("OFEGLI")[9] informed Herrera

---

[4]

      *Id.* ¶ 14.

[5]

      *Id.* ¶¶ 11, 25.

      An answer has been filed by BNY Mellon Investment Servicing (U.S.), Inc., which the filer claims was identified incorrectly in the complaint as The Bank of New York Mellon Corporation.  As neither Mellon nor the entity that filed the answer has moved against the complaint, there is no present need to determine any issues regarding the identity of the proper Mellon defendant.

[6]

      *Id.* ¶¶ 14, 17.

[7]

      *Id.* ¶¶ 15-16.

[8]

      *Id.* ¶ 19.

[9]

      The OFEGLI actually is part of MetLife that administers aspects of the FEGLI program.  *See Reed v. United States*, 182 F.3d 918 (table), 1999 WL 503586 (6th Cir. 1999); *Headley v. Metro. Life Ins. Co.*, No. 98 Civ. 5929 (DLC), 2000 WL 987863, at *1 (S.D.N.Y. July 18, 2000).

4

by letter that he was the beneficiary of Diaz's FEGLI policy.[10]  By that time, the Zelenzes had

misappropriated the entire contents of the Total Control Account.[11]

      According to the complaint, MetLife failed to conduct a reasonable investigation of

Ms. Zelenz's claim before sending her the checkbook for the account containing the insurance

proceeds.  It points out in particular that the claim itself showed that Diaz had resided with plaintiff

in New Jersey at the time of her death, whereas the claim sought to have the checkbook sent to a

New York address.[12]

      On the foregoing basis, the complaint asserts four claims against MetLife, two against

the Zelenzes, and one against Mellon.

      It seeks to recover from MetLife on the theories that it: (1) breached the FEGLI

policy by failing to conduct a reasonable investigation and by providing the checkbook to the

Zelenzes,[13] (2) recklessly and in bad faith disregarded the lack of any basis for declining to pay the

policy proceeds to plaintiff,[14] (3) violated the New Jersey Consumer Fraud Act by deceiving Herrera

---

[10]

    Cpt ¶ 9.

    The letter has not been submitted to the Court.

[11]

    *Id.* ¶ 13.

[12]

    *Id.* ¶¶ 14, 20.

    The fact that the address allegedly used by the Zelenzes to effect the alleged scheme differed
from that of Herrera and Diaz at the date of Diaz's death is not necessarily odd.  Herrera
would not have been the first surviving spouse to move residences after the death of a
partner.

[13]

    *Id.* ¶ 27.

[14]

    *Id.* ¶ 30.

5

as to its investigation of his claim,[15] and (4) was negligent in handling and reviewing the claim on the policy.[16]   Herrera seeks to recover from MetLife damages equal to or greater than the policy proceeds.

The claims against the Zelenzes are for conversion and unjust enrichment.[17]   The conversion claim seeks punitive as well as compensatory damages.

Finally, Herrera seeks recovery against Mellon on the theory that he was its customer, that the signatures on the checks drawn on the Total Control Account were forged, and that Mellon is strictly liable for paying the checks on forged signatures.[18]

*The MetLife Motion*

MetLife seeks dismissal of the state law claims against it on the ground that plaintiff's claims are preempted by the Federal Employees Group Life Insurance Act ("FEGLIA").[19] In the alternative, it argues that the bad faith, New Jersey Consumer Fraud Act, and negligence claims against it should be dismissed for failure to state a claim upon which relief may be granted. Accordingly, in passing on the MetLife motion, the Court considers only the complaint, the allegations of which are assumed for this purpose to be true, and the FEGLI policy, which is

---

[15] *Id.* ¶ 33.

[16] *Id.* ¶¶ 36-37.

[17] *Id.* ¶¶ 40, 44.

[18] *Id.* ¶¶ 48-50.

[19] 5 U.S.C. § 8701 *et seq.*

incorporated by reference.

*The Zelenzes' Motion*

        Herrera and the Zelenzes have narrowed the dispute between them by stipulating that the death benefits under Diaz's federal TSP account and payments on the annuity held by her pursuant to the Federal Employees Retirement System have been paid to plaintiff and that his claim with respect to those benefits therefore is moot.  The Zelenzes' motion therefore survives only with respect to the claims relating to their having obtained the FEGLI proceeds.  They seek dismissal for lack of subject matter jurisdiction on the theory that Herrera lacks standing or, alternatively, for failure to state a claim upon which relief may be granted.  The motion is supported by affidavits of Ms. Zelenz and Guillermo Gutierrez, who is a son of Diaz.  These affidavits properly are considered on the motion to dismiss for lack of standing, which is not limited to the allegations of the complaint.

        The affidavits submitted by the Zelenzes assert the following:

        Gutierrez resided with Diaz and Herrera until Diaz died.  Herrera spoke Spanish on a daily basis and was not proficient in English, requiring assistance with English language conversations and transactions.[20]  Herrera openly acknowledged that he was an illegal alien and rejected Diaz's offer to sponsor him for permanent residency, as he understood that this would have required him to leave the country for a year and then to seek to reenter legally.[21]

        When Diaz passed away, Herrera initially was named the temporary administrator

---

[20]        Gutierrez Aff. ¶¶ 3-4.

[21]        *Id.* ¶¶ 5-6.

of her estate.  On October 13, 2006, however, Ms. Zelenz submitted a letter to the Surrogate Court for Hudson County, New Jersey, asking that she be substituted for Herrera as temporary administrator.  According to Gutierrez, both he and Herrera authorized her to sign the letter on their behalves.[22]  In January 2007, Zelenz was substituted as the temporary administrator of Diaz's estate.[23]

On October 3, 2007, sixteen months after Diaz's death, Ms. Zelenz filed an application for FEGLI benefits.  The application accurately reflected that Herrera was Diaz's widower.[24]  It falsely gave as his address the address of the Zelenzes' home.

On or about July 26, 2008, Ms. Zelenz received a copy of a letter from OFEGLI addressed to Herrera, but at her residence, which stated that Diaz had not designated a beneficiary under her FEGLI policy and that Herrera should submit an application for benefits as the surviving spouse.[25]  Shortly thereafter, Ms. Zelenz was advised by OFEGLI that her claim on the policy "was denied in favor of Herrera's status as surviving spouse notwithstanding that his application [like her own] was submitted outside the time period specific [*sic*] in 8 U.S.C. § 1611(b)."[26]

Significantly, Ms. Zelenz has not denied Herrera's charge that she then made a claim for the FEGLI proceeds in Herrera's name, forged his signature to it, procured the checkbook for

---

[22]  *Id.* ¶¶ 9-11 & Ex. A.

[23]  K. Zelenz Aff. ¶ 4.

[24]  *Id.* ¶ 5 & Ex. A.

[25]  *Id.* ¶ 6 & Ex. C.

[26]  *Id.* ¶ 7 & Ex. D.

8

the Total Control Account from MetLife, and forged checks on that account totaling $302,820.89 for the benefit of herself, her husband, and others.  No copy of that claim, however, is before the Court.

*Discussion*

*The MetLife Motion*

MetLife argues that all of plaintiff's state law claims are preempted by FEGLIA or, alternatively, that his second through fourth causes of action – bad faith, violation of the New Jersey Consumer Fraud Act, and negligence – should be dismissed on the ground that they fail to state a claim upon which relief may be granted under state law.

*Preemption*

"The question of whether a federal statute preempts state law is 'basically one of congressional intent.'"[27]  "Ordinary . . . preemption comes in three familiar forms:  express preemption, conflict preemption, and field preemption."[28]  It exists "when: (1) the preemptive intent is explicitly stated in [a federal] statute's language or implicitly contained in its structure and purpose; (2) state law actually conflicts with federal law; or (3) federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to

---

[27]
        *Drake v. Lab. Corp. of Am. Holdings*, 458 F.3d 48, 55 (2d Cir. 2006) (quoting *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 30 (1996)).

[28]
        *E.g.*, *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 273 (2d Cir. 2005) (footnote omitted).

        Complete preemption, a somewhat different and very narrow doctrine, see *id.* at 272, has no bearing here.

supplement it."[29]

FEGLIA established a scheme for making group life insurance available to federal employees. The statute provides for the purchase by the government of an insurance policy pursuant to which the lives of federal employees may be insured. It mandates an order of precedence for payment of death benefits that become payable under the group policy – first to any named beneficiary, absent a named beneficiary to any surviving spouse, absent either of the foregoing to the child or children of the deceased employee and their descendants, and so on.[30] It goes on to provide that if no claim has been filed within one year after the date of death by a person entitled to payment under Section 8705(a), or if payment to such a claimant is prohibited by law, payment is to be made to the next person or persons according to the order of precedence.[31] Section 8709(d)(1) then states:

> "The provisions of any contract under this chapter which relate to the nature or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any law of any State or political subdivision thereof, or any regulation issued thereunder, which relates to group life insurance to the extent that the law or regulation is inconsistent with the contractual provisions."[32]

MetLife disclaims any express preemption argument here[33] and for good reason.

---

[29]

*Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 641 (2d Cir. 2005) (internal quotation marks omitted) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992), *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977), and *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982)).

[30]

5 U.S.C. § 8705(a).

[31]

*Id.* § 8705(b).

[32]

*Id.* § 8709(d)(1).

[33]

Transcript, Dec. 14, 2011 ("Tr."), at 6.

Herrera claims that MetLife: (1) breached the insurance policy, its duty of good faith and fair dealing and a duty of care by failing to exercise reasonable caution in paying the claim that allegedly was forged by Ms. Zelenz, (2) rejected his subsequent claim without any colorable basis,[34] and (3) violated the New Jersey Consumer Fraud Act by deceiving Herrera as to its investigation of his claim.  He asserts also that it was negligent in handling and reviewing the claim on the policy.  But Section 8709(d)(1) expressly preempts only state law claims that "relate to the nature or extent of coverage or benefits . . . to the extent that the [state] law . . . is inconsistent with" a provision of the insurance policy.  MetLife points to no provision of the policy that would be inconsistent with a recovery by Herrera on any of these theories.

Nor does MetLife make a convincing actual conflict argument.  While one readily could imagine cases raising such problems – for example, a state law provision that, if applied, would change the order of precedence set out in Section 8705(a) – this is not such a case.  So the essence of MetLife's position must be that FEGLIA "so thoroughly occupies [this] legislative field as to make reasonable the inference that Congress left no room for the States to supplement it."[35]

The first problem with this contention is that the explicit preemption clause in FEGLIA is quite narrow.  It preempts only state law claims that "relate to the nature or extent of coverage or benefits . . . to the extent that the [state] law . . . is inconsistent with" a provision of the insurance policy.  The extremely limited scope of this language "reveals Congress' intent not to preempt the role of the states in supplementing federal regulation, but rather an intent to preserve

---

[34] There is some question whether Herrera submitted a formal claim for the insurance proceeds. MetLife, however, acknowledges that any failure to do so is immaterial, as the complaint in this case reflects a demand for payment that MetLife has rejected.  *Id.* at 12-13.

[35] Indeed, MetLife advanced this position at oral argument. *Id.* at 6.

it."[36]

        Second, FEGLIA does not create federal remedies.  Unlike ERISA,[37] for example, it creates no statutory cause of action in favor of a beneficiary or putative beneficiary even to recover benefits allegedly due under the group insurance policy contemplated by the statute.[38] Indeed, FEGLIA arguably does not confer subject matter jurisdiction on the district courts to hear actions for unpaid benefits.  The absence of any statutory cause of action or express jurisdictional grant thus demonstrates Congress' intention that those claiming benefits under the group life insurance policy would be remitted to common law actions on the policy and that these actions would be brought in state courts absent the existence of diversity of citizenship.  This structure is entirely inconsistent with the suggestion that Congress so thoroughly occupied the field as to preclude state law supplementation.

        MetLife nevertheless argues that FEGLIA preempts state laws relating to the order of preference for the payment of FEGLI benefits and that it should be read as preempting the imposition by state law of states' own views as to what life insurance benefits the federal government should provide to its employees.  The Court assumes *arguendo* that MetLife is correct

---

[36]

        *See, e.g.*, *Med. Soc. of State of N.Y. v. Cuomo*, 976 F.2d 812, 818 (2d Cir. 1992) (quoting *id.*, 777 F. Supp. 1157, 1162 (S.D.N.Y. 1991)) (internal quotation marks omitted); *see also Metro. Life Ins. Co. v. Barbour*, 555 F. Supp. 2d 91, 98 (D.D.C. 2008) ("[B]reach of fiduciary duty, intentional infliction of emotional distress, and fraudulent misrepresentation [claims] . . . are asserted independent of any determination by MetLife as to the rightful beneficiary of the policy proceeds . . . .[T]his Court agrees with the Second Circuit that claims with these characteristics fall outside of FEGLI's preemption clause.") (citing *Devlin v. United States*, 352 F.3d 525, 544 (2d Cir. 2003)).

[37]

        29 U.S.C. § 1132(a)(1)(B).

[38]

        MetLife acknowledges that Congress easily could have created a breach of contract claim under FEGLIA but did not do so.  Tr. at 11.

as to these examples.  But these would be instances of conflict preemption.  They are not suggestive of an intention on the part of Congress to occupy the field and thus to foreclose any state law role with respect to federal employee group life insurance.

Finally, and in any case, preemption of the state law claims would not require dismissal of Herrera's first claim against MetLife.  Even if state law could not supply the rule of decision in determining his claim that MetLife breached the group insurance policy, there must be some remedy if there was a breach, as Congress surely did not intend to create a scheme of group insurance and then leave putative beneficiaries without any legal claim to the policy proceeds.  Accordingly, the only rational reading of the statute, even assuming preemption, is that Herrera has a federal common law breach of contract claim as to which the Court must look to state law for guidance albeit not a binding rule of decision.[39]

*The Alternative Relief Sought*

1.   *Bad Faith Denial of Claim*

The second claim for relief seeks recovery on the theory that MetLife denied Herrera's claim for policy benefits in bad faith in that there was no basis for the denial.[40]  While the complaint does not explicitly allege that any claim by plaintiff was denied, the Court infers from

---

[39]

    *See, e.g.*, *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 460 (1957) ("Having jurisdiction over the suit, the court was not powerless to fashion an appropriate federal remedy.").

[40]

    *See* Cpt ¶¶ 30-31.

MetLife's characterization of the claim[41] and plaintiff's tacit acceptance of the characterization[42] that the claim consists of the following.  Ms. Zelenz made a claim on the policy in plaintiff's name, but without his authority.  MetLife paid the claim.  Although it now recognizes that plaintiff is the appropriate beneficiary, it has not paid him because it previously paid her on the forged application.

At the outset is a conflict of laws issue.  New York does not recognize any claim such as this.[43]  New Jersey on the other hand, allows a claim for bad faith refusal to pay on an insurance policy where the plaintiff can demonstrate that the reasons for withholding benefits are not even "fairly debatable."[44]  In resolving such a conflict, New York applies the law of the state with the most significant contacts.[45]  While the complaint alleges that Herrera and Diaz were New Jersey residents and that MetLife is a New York corporation headquartered here, the pleadings do not establish facts sufficient to make a conclusive choice of law.  Hence, the Court applies New Jersey law for purposes of this motion, as it would be premature to afford MetLife the benefit of the more restrictive New York rule.

---

[41]

MetLife Mem. [DI 23], at 7-8.

[42]

*See* Pl. Mem. [DI 31], at 7-8.

[43]

*See New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995); *Roconova v. Equitable Life Assurance Soc'y*, 83 N.Y.2d 603, 613 (1994); *see also Acquista v. N.Y. Life Ins. Co.*, 285 A.D.2d 73, 730 N.Y.S.2d 272, 278 (1st Dept. 2001) ("We are unwilling to adopt the widely-accepted tort cause of action for "bad faith" in the context of a first-party claim, because we recognize that to do so would constitute an extreme change in the law of this State.").

[44]

*Pickett v. Lloyd's*, 621 A.2d 445, 131 N.J. 457, 473 (1993).

[45]

*See, e.g.*, *Strubbe v. Sonnenschein*, 299 F.2d 185, 189 (2d Cir. 1962).

New York, it should be noted, would foreclose plaintiff's claim.

14

The complaint makes clear plaintiff's theory that MetLife paid the policy pursuant to an application bearing a forgery of his signature.  Thus, on plaintiff's theory, MetLife thought it was paying the benefits to the order of the correct beneficiary but, by reason of the Zelenzes' alleged forgery, paid the wrong persons.  Hence, the issue is whether there is any fairly debatable basis for MetLife's position that its payment of the death benefit to the wrong persons because it was fooled by or negligent in paying on a forged application eliminated its obligation to pay the death benefit to Herrera, the surviving spouse who allegedly was entitled to the money by statute.  While neither side has cited a controlling authority on the point, the Court is not prepared, without a fuller development of the facts, to exclude the possibility that MetLife's failure to pay Herrera and, if it was so advised, then to pursue the Zelenzes to recover the money it mistakenly had paid to them was actionable, assuming New Jersey law ultimately governs.  Accordingly, the second claim for relief survives MetLife's motion to dismiss.

2.      *The New Jersey Consumer Fraud Act*

The New Jersey Consumer Fraud Act provides in relevant part that the

"use . . . by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . with intent that others rely upon [it] . . . in connection with the sale or advertisement of any merchandise or real estate . . . is declared to be an unlawful practice . . . ."[46]

Although the complaint alleges that MetLife's actions violated this statute, it does not allege that Herrera is a "consumer" with respect to the FEGLI policy.   The entire thrust of the New Jersey

---

[46]   N.J. STAT. ANN. § 56:8-2.

15

Consumer Fraud Act is "pointed to products and services sold to *consumers* in the popular sense."[47] Thus, although the Act does not define the term "consumer," New Jersey courts nevertheless have construed the statute as applying only to consumers and defines "consumer" as "one who uses (economic) goods, and so diminishes or destroys their utilities."[48] Here, the life insurance contract was between Diaz and MetLife.  Herrera acknowledges that he was not a party to the contract and that he simply was a beneficiary because of his relationship with Diaz.[49]  Accordingly, Herrera cannot be considered a "consumer" under the statute.

Moreover, even though the New Jersey Supreme Court has yet to decide the issue, the weight of authority holds that the Act does not apply to the payment of insurance benefits.[50]  Nor has plaintiff pleaded fraud in connection with the alleged investigation of the Zelenzes' actions with the requisite particularity.[51]  In any event, the New Jersey Consumer Fraud Act claim must be dismissed.

---

[47]

*Neveroski v. Blair*, 358 A.2d 473, 141 N.J. Super. 365, 378 (App. Div. 1976) (emphasis added).

[48]

*Hundred East Credit Corp. v. Eric Schuster Corp.*, 515 A.2d 246, 212 N.J. Super. 350, 355 (App. Div. 1986), *certif. den.*, 107 N.J. 60 (1986) (quoting *Webster's New International Dictionary, 2d ed.*).

[49]

Pl. Mem. [DI 31], at 9.

[50]

*E.g.*, *Daloisio v. Liberty Mut. Fire Ins. Co.*, 754 F. Supp. 2d 707, 710 (D.N.J. 2010) (collecting cases).

[51]

*See* FED. R. CIV. P. 9(b).

### 3. *Negligence*

Finally, MetLife seeks dismissal of Herrera's claim that MetLife was negligent in processing the claim submitted by the Zelenzes. It argues that no tort claim lies where the alleged breach of duty is identical to and indivisible from the alleged breaches of contract.[52]

Under the law of both New York and New Jersey, "a tort remedy does not arise from a contractual relationship unless the breaching party owes and independent duty imposed by law."[53] In this case, any relationship between Herrera and MetLife flowed from the contract between the government and MetLife of which Herrera was no more than a third-party beneficiary.[54] If MetLife owed him any duty of care with respect to processing claims on the policy, it arose by virtue of the contract. In other words, because this is "a tort claim [that] does no more than assert violations of a duty which is identical to and indivisible from the contract obligations which have allegedly been breached, [it] . . . cannot be sustained."[55] Accordingly, MetLife owed Herrera no independent duty and the negligence claim must be dismissed.

---

[52]

MetLife Mem. [DI 23], at 9-10.

[53]

*Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 170 N.J. 297, 316 (2002); *accord, e.g.*, *Moustakis v. Christie's, Inc.*, 68 A.D.3d 637, 892 N.Y.S.2d 83, 84 (1st Dept. 2009).

[54]

*See Anderson v. U.S. Fidelity and Guar. Co.*, 948 P.2d 1216 (Okla. 1997) (noting that "a life insurance policy beneficiary [was] . . . a third-party beneficiary under a life insurance policy").

[55]

*See, e.g.*, *Clarendon Nat'l Ins. Co. v. Health Plan Adm'rs*, No. 08 Civ. 6279, 2009 WL 3053736, at *3 (S.D.N.Y. Sept. 24, 2009) (internal citations omitted).

*The Zelenzes' Motion*

The Zelenzes seek dismissal of Herrera's claims against them for lack of standing, arguing that he has failed to allege any injury in fact because he had no right to the FEGLI insurance proceeds in the first place, and for failure to state a claim upon which relief may be granted.

*Standing*

Standing is an essential prerequisite to Article III jurisdiction. The standing inquiry has three elements: a "plaintiff must allege [1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief."[56] The Zelenzes argue that Herrera's claim to the FEGLI benefits is barred because it is untimely and, in any case, because he is an illegal alien precluded by statute from obtaining any "Federal public benefits." Accordingly, they suggest, he has not alleged any of the three requisite elements. As the standing argument goes to subject matter jurisdiction, their affidavits are appropriately considered with respect to this contention.[57]

1.      *Timeliness*

The timeliness argument rests on 5 U.S.C. § 8705(b), which provides:

"(b) If, within 1 year after the death of the employee, no claim for payment has been filed by a person entitled under the order of precedence named by subsection (a) of this section, or if payment to the person within that period is prohibited by Federal

---

[56]

    *Allen v. Wright*, 468 U.S. 737, 751 (1984); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

[57]

    *E.g.*, *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).

statute or regulation, payment may be made in the order of precedence as if the person had predeceased the employee, and the payment bars recovery by any other person."

The argument is that Herrera's potential claim became time-barred when he failed to file it within one year after Diaz's death, at which point MetLife became entitled to pay the proceeds to the next tier of statutory beneficiaries – Diaz's children.[58]

The language of Section 8705(b) does not support the Zelenzes.  That provision is not drafted as a statute of limitations or of repose.  Rather, it provides that the failure of a person entitled to the benefits under Section 8705(a) to claim them within one year permits (rather than requires) the carrier to pay the death benefit to the member or members of the next tier in the order of precedence.  If it does so, the payment, not the passage of time, bars recovery by any member or members of the higher tiers.

The fact that there is no one-year time bar is confirmed by Section 8705(c), which provides:

"(c) If, within 2 years after the death of the employee, no claim for payment has been filed by a person entitled under the order of precedence named by subsection (a) of this section, and neither the Office [of Personnel Management ("OPM")] nor the administrative office established by the company concerned pursuant to section 8709(b) of this title [OFEGLI] has received notice that such a claim will be made, payment may be made to the claimant who in the judgment of the Office is equitably entitled thereto, and the payment bars recovery by any other person."[59]

Subsection (c) thus suggests that the expiration of the one-year period without the filing of a claim by a person in the order of precedence is not fatal to that claim, as it affords a second year during

---

[58]

Zelenz Mem. [DI 18], at 3-4, 9-10.

[59]

The substance of 5 U.S.C. § 8705(b)-(c) is repeated in Amendment 36 of the FEGLI Group Policy No. 17000-G.  Walter Decl. [DI 21], Ex. A.

which OPM may not direct that payment be made to a person whom it deems equitably entitled to it.  The implication is that OPM is foreclosed from making such a direction if a belated claim is received or, indeed, if OFEGLI or OPM receive notice that such a claim will be made – a foreclosure that would be pointless unless an otherwise proper belated claim must or could be paid.

In this case, MetLife did not pay the benefits to the member or members of the next tier in the order of precedence upon the expiration of a year following Diaz's death.  Rather, it honored what the complaint alleges was a claim that purported to have been made by Herrera but that in fact was a forgery.  That the forger allegedly was Ms. Zelenz, who was one of at least two members of the next tier – Gutierrez being another – and that she thus obtained proceeds that MetLife intended to pay to Herrera as the member of a higher tier in the order of precedence, is incidental.  There was no payment, at least no witting payment, to the member or members of the next tier in the order of precedence, and it is only such a payment that bars recovery of persons in higher-ranked tiers.[60]  Moreover, the Zelenzes' argument proves too much.  For if they are right in saying that Herrera's failure to claim the benefits within one year of the date of death barred his claim, the failure of Diaz's children, including Zelenz, to make a timely claim barred them as well.

## 2.   *Immigration Status*

The argument based on Herrera's alleged immigration status begins with Section 8705(b) of FEGLIA, which recognizes the possibility that payment of FEGLI benefits may be

---

[60]   The facts here distinguish this case from the cases on which the Zelenzes rely. *See Jacobs v. United States*, 794 F. Supp. 509 (S.D.N.Y. 1992); *Brown v. Wharton*, 756 F. Supp. 223 (E.D. Pa. 1990).  In both of those cases, MetLife made, and intended to make, a payment to an individual in the next tier in the order of precedence.  It was that payment – not the passage of time – that foreclosed the proper beneficiary from recovering in those cases.

"prohibited by Federal statute or regulation . . . ."  The Zelenzes rely on this provision to argue that payment is barred by Section 401 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, better known as the Welfare Reform Act, which provides in relevant part, with exceptions not relevant here, that "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit (as defined in subsection (c) of this section)."[61]  It is undisputed for purposes of the standing argument that Herrera is not a "qualified alien" within the meaning of the statute.  The Zelenzes' argument therefore turns on whether the death benefit under Diaz's group life insurance policy is a "Federal public benefit."

The statute defines "Federal public benefit," insofar as is relevant here, as follows:

"(A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and

"(B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States."[62]

And it is on the question of whether that death benefit is a "Federal public benefit" that the United States has appeared as *amicus* to argue that it is not.

As in all cases involving the construction of a statute, the Court begins with its plain language, which is not at all helpful to the Zelenzes.  As an initial matter, the proceeds of the group life insurance policy issued by MetLife to the government and availed of by Diaz are not a "grant, contract, loan, professional license, . . . commercial license[,] . . . retirement, welfare, health,

---

[61]

8 U.S.C. § 1611(a).

[62]

*Id.* § 1611(c)(1).

disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States."  And even if the group policy itself properly could be regarded as a "contract . . . provided by an agency of the United States or by appropriated funds of the United States," the Welfare Reform Act makes clear that the benefits to be withheld from certain aliens must be "Federal *public* benefits" – that is, benefits that are available to the public at large.  Far from being a benefit available to the public at large, the federal group insurance at issue here is offered to only to federal employees as part of their compensation.  Indeed, the benefit here – in the sense that the word "benefit" is used in the Welfare Reform Act – actually was a benefit offered to Diaz, not to Herrera.  Herrera simply claims monies allegedly due to him by virtue of the contract between the government and MetLife of which Diaz availed herself.  There is nothing in the language of the Welfare Reform Act that supports the Zelenzes' argument that it foreclosed anyone from receiving the proceeds of group insurance on the lives of federal employees or retirees by virtue of the immigration status of the putative recipients.  Indeed, such a construction would be inconsistent with the regulations under FEGLIA, which long have provided that "[a]ny individual . . . can be named as a beneficiary" of FEGLI.[63]

Even if there were ambiguity on this point, and this Court thinks there is not, that ambiguity would be eliminated by the legislative history of the statute.  The provision was enacted as part of the Welfare Reform Act.  The House report makes clear that the goal of this provision was

---

[63] 5 C.F.R. § 870.802(e) ("Any individual, firm, corporation, or legal entity can be named as a beneficiary, except an agency of the Federal or District of Columbia Government.").

to ensure that "individuals who are illegally present in the U.S. or here for a temporary purpose . . . should not receive public *welfare* benefits."[64]  It demonstrates also that the concern was with *publicly available* programs such as "Supplemental Security Income, Aid to Families with Dependent Children, housing assistance, and Food Stamps."  Thus, the legislative history establishes that Congress meant to change the law only with respect to publicly available welfare benefits and did not intend to alter the law outside of that context as, for example, by restricting those entitled to collect the proceeds of federal group life insurance obtained by federal employees.

      The Zelenzes attempt to salvage their argument by relying on language in 8 U.S.C. § 1643 – an amendment to the Welfare Reform Act enacted a year after that statute was passed.  In relevant part, it states that:

> "[T]he limitations on eligibility for benefits under this chapter shall not apply to eligibility for benefits of aliens who are not residing, or present, in the United States with respect to – (1) wages, pensions, annuities, and other earned payments to which an alien is entitled resulting from employment by, or on behalf of, a Federal, State, or local government agency . . . ."[65]

They argue that this provision demonstrates that confusion existed after the Welfare Reform Act passed about whether "benefits could be made to aliens who were residing outside the United States" and that this provision clarified that benefits earned by aliens while residing outside the United States could received by them as long as they were residing outside the United States.[66]  But the argument is unpersuasive for the simple reason that it applies to the eligibility of aliens for benefits "with respect to wages, pensions, annuities, and other earned payments" – in other words,

---

[64]      H.R. REP. NO. 104-651, at 1208-09 (1996) (emphasis added).

[65]      8 U.S.C. § 1643(b).

[66]      Tr. at 20.

for compensation and benefits earned by aliens by virtue of the aliens' employment by the United States or state or local governments.  The FEGLI proceeds that Herrera seeks were a benefit earned by Diaz, a citizen, by virtue of her public service to the United States.  There is no suggestion that Herrera ever was a public employee, much less that his claim for the policy proceeds derives from any such employment.

In sum, this Court agrees with the government's position and holds that the proceeds of Diaz's FEGLI policy are not a "Federal public benefit" and that Herrera is not disqualified from receiving them by virtue of his alleged immigration status.

*Sufficiency of Conversion and Unjust Enrichment Claims*

Finally, the Zelenzes argue that Herrera's claims for conversion and unjust enrichment fail to state a claim upon which relief may be granted.  The argument with respect to the first claim is that Herrera cannot establish conversion because he had no right to the death benefit by reason of his immigration status.[67]  The unjust enrichment claim is insufficient, the Zelenzes contend, because recognizing such a claim improperly would allow Herrera to profit from his alleged crime of illegal entry into the United States.[68] Thus, both arguments depend upon the premise that Herrera is in the United States illegally.  Their arguments are not persuasive.

As an initial matter, the complaint does not allege that Herrera is an illegal alien, a fact put forth only by means of an affidavit submitted by the Zelenzes in support of their subject matter jurisdiction argument.  As the Court has elected not to consider materials outside the

---

[67]     Zelenz Mem. [DI 18], at 15.

[68]     *Id.* at 16-17.

complaint for the purposes of so much of the Zelenzes' motion as seeks dismissal under Rule 12(b)(6), there is no basis for this argument at this stage of the proceeding.  Even if there were, however, these arguments would fail.

First, the Court already has held that the death benefit under the FEGLI policy is not a "Federal public benefit" and, in consequence, that Herrera is not precluded from collecting on the policy.  The conversion claim therefore is sufficient.

Second, there is no sufficient connection between Herrera's alleged status as an illegal alien and collecting on his late wife's life insurance to foreclose his unjust enrichment claim and, assuming the allegations of the complaint are true, thus to permit the Zelenzes to retain a benefit to which they are not entitled.  If Herrera in fact proves to be entitled to collect on the insurance policy, he will be entitled to do so because he is Diaz's surviving spouse, not because he is an illegal alien.  He will not have acquired that entitlement, in the words of the case cited by the Zelenzes, "by his own crime."[69]

*Conclusion*

For the foregoing reasons:

1.       The motion of defendant Metropolitan Life Insurance Company to dismiss the corrected amended complaint [DI 20] is granted to the extent that the third and fourth claims for relief are dismissed and denied in all other respects.

2.       The motion of defendants Karen and Mark Zelenz to dismiss the corrected

---

[69]       *Id.* at 16 (quoting *Barker v. Kallash*, 91 A.D.2d 372, 459 N.Y.S.2d 296, 298-99 (2d Dept. 1983)).

first amended complaint [DI 24] is denied in all respects.

SO ORDERED.

Dated:          December 19, 2011

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)